WELLS v FIRESTONE TIRE AND RUBBER COMPANY

Docket No. 65372. Argued December 6, 1983 (Calendar No. 1).—Decided December 28, 1984. Released February 11, 1985.

James Wells brought a third-party products liability action in the Muskegon Circuit Court against Firestone Tire and Rubber Company for damages resulting from injuries received in the course of his employment with Muskegon Firestone Auto Supply and Service Stores, a wholly owned corporate subsidiary of Firestone, when a truck tire rim manufactured by Firestone blew apart. The court, Charles A. Larnard, J., found that Muskegon Firestone was a separate corporate entity and denied Firestone's motion for accelerated judgment. The Court of Appeals, Danhof, C.J., and R. B. Burns and MacKenzie, JJ., reversed, holding that Firestone was the plaintiff's employer for purposes of the workers' compensation act and that the action was barred under the exclusive remedy provision of the act (Docket No. 44027). The plaintiff appeals.

In an opinion by Justice Cavanagh, joined by Chief Justice Williams and Justices Ryan and Brickley, the Supreme Court *held:*

The plaintiff's products liability action is barred by the exclusive remedy provision of the workers' compensation act. The plaintiff was employed by the defendant and was injured while acting in the course of his employment.

1. The test to be applied to determine whether the defendant was the plaintiff's employer on the date of the injury is the

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4, 5] 63 Am Jur 2d, Products Liability § 906.

81 Am Jur 2d, Workmen's Compensation §§ 50, 51.

Workmen's Compensation Act as furnishing exclusive remedy for employee injured by product manufactured, sold, or distributed by employer. 9 ALR4th 873.

[2, 5] 81 Am Jur 2d, Workmen's Compensation §§ 53, 152 *et seq.*

[3, 5] 18 Am Jur 2d, Corporations § 13 *et seq.*

Workers' compensation immunity as extending to one owning controlling interest in employer corporation. 30 ALR4th 948.

[4] 82 Am Jur 2d, Workmen's Compensation § 288.

Modern status: "dual capacity doctrine" as basis for employee's recovery from employer in tort. 23 ALR4th 1151.

economic reality test. The test requires viewing an employment situation as a whole in relation to the statutory scheme of the workers' compensation act with the goal of preserving and securing the rights and privileges of all parties. Control is a factor to be considered, as is payment of wages, authority to hire and fire, and the responsibility for the maintenance of discipline, but no one factor is controlling.

2. In this case, the defendant maintained one workers' compensation insurance policy for all of its local retail stores, and its insurance carrier voluntarily paid the plaintiff's benefits. There is no evidence that the defendant maintained a separate corporation in Muskegon to evade its responsibilities under the workers' compensation act or that it did not consider itself to be the plaintiff's employer. Nor did the plaintiff rely on the distinction between the defendant and its subsidiary when he asserted that the defendant was his employer in his petition for workers' compensation benefits.

3. The fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. Generally, a corporation will not be permitted to pierce its own corporate veil in order to prove that it and a subsidiary are one entity. However, where respecting the separate entities would subvert justice or cause a result contrary to a clearly overriding public policy, the fiction is ignored by the courts. In this case, the separate entities must be disregarded because of the important public policies underlying the workers' compensation act. The act protects workers and employers. Covered workers are assured of compensation in the event that they sustain employment-related injuries. By assuming responsibility for such injuries, employers are protected from potentially excessive damage awards. If liberal construction is applied when a worker seeks benefits, the same construction should be applied when an employer asserts the exclusive remedy provision of the act as a defense in a tort action. The plaintiff did not rely on the distinction in applying for benefits and should not now be permitted to deny the relationship that he asserted and upon which the defendant relied in assuming responsibility for payment of the benefits.

4. The argument that the exclusive remedy provision additionally does not apply in this case because the defendant occupied a status other than that of the plaintiff's employer must also be rejected. Under certain circumstances, an employer may act in a dual capacity. However, for the dual-capacity doctrine to be applied, the employer must have a second identity so completely distinct, removed from, and unre-

lated to the status as employer that by established standards the law will recognize it as a separate legal person. In this case, the plaintiff's injuries occurred while he was acting in the course of and within the scope of his employment.

Affirmed.

Justice Levin, joined by Justices Kavanagh and Boyle, dissenting, stated that economic reality is not determinative of whether Firestone or Muskegon Firestone was the plaintiff's actual employer for purposes of the exclusive remedy provision of the workers' compensation act. As applied in this case, the test creates a new, rather than characterizes an existing, employment relationship. By applying general principles, it must be concluded that Muskegon Firestone and not Firestone was the plaintiff's employer, and therefore the plaintiff's action against Firestone is not barred by the exclusive remedy provision.

The economic reality test is a substitute for the control test which is a means of characterizing an employment relationship and of determining whether employment was of a subcontractor or of a servant. In this case, however, there is no employment relationship between Firestone and Muskegon Firestone. The issue is not whether the control test should be abandoned and an economic reality test adopted, but whether an economic reality test should be made determinative of whether parent and subsidiary corporations are a single entity for the purposes of the exclusive remedy provision of the workers' compensation act. Economic reality analysis would destabilize workers' compensation and corporate law. Generally, the separateness of corporate entities is respected by the courts and the corporate veil is pierced only to prevent fraud or injustice. Total domination by a parent corporation of a subsidiary does not justify piercing the corporate veil. The question whether there is an employment relationship between Firestone and Wells should be resolved by consent and not by implication.

97 Mich App 790; 296 NW2d 174 (1980) affirmed.

OPINION OF THE COURT

1. WORKERS' COMPENSATION — EXCLUSIVE REMEDY.

A products liability action against a product manufacturer was barred by the exclusive remedy provision of the workers' compensation act where, viewing the plaintiff's employment by a subsidiary of the manufacturer as a whole, the manufacturer and the subsidiary were one entity and the manufacturer thus was the employer of the plaintiff (MCL 418.131; MSA 17.237[131]).

2. WORKERS' COMPENSATION — EXCLUSIVE REMEDY — ECONOMIC REALITY TEST.

The economic reality of an employment situation as a whole must be examined in order to determine whether a defendant in a tort action was an employer of the plaintiff on the date of the plaintiff's injury for purposes of applying the exclusive remedy provision of the workers' compensation act; control is a factor to be considered, as is payment of wages, authority to hire and fire, and the responsibility for the maintenance of discipline, but no one factor is controlling (MCL 418.131; MSA 17.237[131]).

3. CORPORATIONS — CORPORATE ENTITIES — PIERCING THE CORPORATE VEIL.

The fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice; generally, a corporation will not be permitted to pierce its own corporate veil in order to prove that it and a subsidiary are one entity, but where respecting the separate entities would subvert justice or cause a result contrary to a clearly overriding public policy, the fiction is ignored by the courts.

4. WORKERS' COMPENSATION — EXCLUSIVE REMEDY — DUAL-CAPACITY TEST.

An employer may act in a dual capacity so as to defeat application of the exclusive remedy provision of the workers' compensation act; however, for the dual-capacity doctrine to be applied, the employer must have a second identity so completely distinct, removed from, and unrelated to the status as employer that by established standards the law will recognize it as a separate legal person (MCL 418.131; MSA 17.237[131]).

DISSENTING OPINION BY LEVIN, J.

5. WORKERS' COMPENSATION — EXCLUSIVE REMEDY — ECONOMIC REALITY TEST — CORPORATIONS.

*The determination whether a parent corporation and a subsidiary are a single entity for the purposes of the exclusive remedy provision of the workers' compensation act should not be made on the basis of an economic reality test; generally, the separateness of corporate entities should be respected and a corporate veil pierced only to prevent fraud or injustice and not merely where a subsidiary is totally dominated by the parent corporation (MCL 418.131; MSA 17.237[131]).*

*McCroskey, Feldman, Cochrane & Brock* (by *J. Walter Brock)* for the plaintiff.

*Smith, Haughey, Rice & Roegge* (by *Lance R. Mather)* for the defendant.

CAVANAGH, J. The facts in this matter appear undisputed and were succinctly stated by the Court of Appeals:

"The defendant, Firestone Tire & Rubber Company (hereinafter 'Firestone'), is an Ohio corporation with its principal headquarters in Akron, Ohio. Firestone has various retail stores around the country, some of which are run as divisions of Firestone while some are wholly owned or majority-owned subsidiary corporations. In Muskegon, Michigan, Firestone has two outlets; one is operated as a division of Firestone, and the second is Muskegon Firestone Auto Supply and Service Stores, located at 925 Terrace Street, Muskegon, Michigan, hereinafter termed 'Muskegon Firestone'. Muskegon Firestone was a wholly owned subsidiary corporation at the time plaintiff's cause of action arose.

"Plaintiff James Wells worked at Muskegon Firestone and on October 21, 1971, while acting in the course of his employment changing a tube and tire on a truck rim manufactured by Firestone, the rim blew apart, injuring him seriously. Muskegon Firestone was originally a dealership but was set up as a Michigan corporation around 1930. Defendant Firestone purchased most of its assets at that time, allowing the manager to retain a minority stock interest. Defendant Firestone has owned 100% of the stock in Muskegon Firestone since around 1960. At the time of plaintiff's accident, all of the subsidiary's directors were employees of defendant. In early 1977, the corporation, Muskegon Firestone, was liquidated and is now run as a retail division of defendant.

"Firestone carried the worker's compensation coverage for all of the local branches including Muskegon Firestone. Plaintiff filed for compensation citing Firestone as his employer and commenced receiving benefits from Firestone's insurance carrier, Liberty Mutual Insurance Company, which continue to be paid at this time.

"Plaintiff, subsequent to receiving benefits from Fire-

stone, commenced the instant third-party product liability suit against Firestone. Defendant Firestone moved for summary judgment on the basis that plaintiff was barred from bringing the action against Firestone by the exclusive remedy provision of the Michigan Worker's Disability Compensation Act of 1969, MCL 418.131; MSA 17.237(131).

"The trial court found that plaintiff was not an employee of defendant Firestone but of the separate corporate entity Muskegon Firestone. Summary judgment was denied and leave to appeal to this Court was granted on June 18, 1979."[1] *Wells v Firestone Tire & Rubber Co,* 97 Mich App 790, 791-793; 296 NW2d 174 (1980).

We must decide whether plaintiff's products liability action is barred by the exclusive remedy provision[2] of the Worker's Disability Compensation Act.[3] That determination necessarily turns on whether an employment relationship existed between plaintiff and defendant. Stated more directly, the question is whether defendant was plaintiff's employer on the date of injury. In answering this question, we initially must determine what test is to be employed. We find direction from this Court's decision in *Nichol v Billot,* 406 Mich 284, 293-294; 279 NW2d 761 (1979):

"Prior to *Tata v Muskovitz,* 354 Mich 695; 94 NW2d 71 (1959), the only test for determining whether a person was an employee or an independent contractor

---

[1] We note that the motion should have been denominated as one for accelerated judgment, pursuant to GCR 1963, 116.1(2), and it will be treated as one because no prejudice to plaintiff is alleged or apparent. See, *e.g., Dagenhardt v Special Machine & Engineering, Inc,* 418 Mich 520, 525, fn 3; 345 NW2d 164 (1984); *Bednarski v General Motors Corp,* 88 Mich App 482, 484, fn 1; 276 NW2d 624 (1979), and the authorities cited therein. We also note that the parties properly stipulated that any factual issues raised by defendant's motion could be resolved by the trial judge. See GCR 1963, 116.3.

[2] MCL 418.131; MSA 17.237(131).

[3] MCL 418.101 *et seq.;* MSA 17.237(101) *et seq.*

centered on the question of control. The control theory
is the traditional common-law test used to delineate the
master-servant relationship. The theory, in its delin-
eation of the servant concept, has for its purpose the
definition and delimitation of the scope of the master's
liability under the doctrine of *respondeat superior.*
Because most compensation acts contain no specific
definition of the term 'employee', it was generally taken
for granted that the common-law definition of employee,
or servant, used for purposes of vicarious tort liability
was to be used for purposes of workmen's compensation
laws.

"In *Tata v Muskovitz, supra,* this Court adopted the
dissenting opinion of Mr. Justice TALBOT SMITH in
*Powell v Employment Security Comm,* 345 Mich 455; 75
NW2d 874 (1956), in which he set forth the economic
reality test as the proper guide to relevant interpreta-
tion of the workmen's compensation statute. See, also,
*Schulte v American Box Board Co,* 358 Mich 21; 99
NW2d 367 (1959); *Goodchild v Erickson,* 375 Mich 289;
134 NW2d 191 (1965); *Solakis v Roberts,* 395 Mich 13;
233 NW2d 1 (1975); *Askew v Macomber,* 398 Mich 212;
247 NW2d 288 (1976)."

Following our departure from the common-law
control test, this Court has consistently utilized
the economic reality test when questions have
arisen relative to the existence of an employment
relationship. While this Court's earlier applica-
tions of the economic reality test dealt with the
distinction between an independent contractor and
an employee or, as in *Farrell v Dearborn Mfg Co,*
416 Mich 267; 330 NW2d 397 (1982), with dual
employers in a labor-broker situation, we believe it
to be appropriate and consistent to utilize the
economic reality test in determining in this case
which of two separate corporations, parent or
subsidiary, was plaintiff's actual employer for pur-
poses of the Worker's Disability Compensation Act.

The economic reality test was succinctly de-
scribed in *Farrell,* p 276:

"The issue of whether employment exists for purposes of the workers' compensation law has been frequently addressed by our courts. The standard to be used is the economic reality test, a broad approach which, in the oft-quoted language of Justice TALBOT SMITH, looks to the totality of the circumstances surrounding the performed work.

" 'Control is a factor, as is payment of wages, hiring and firing, and the responsibility for the maintenance of discipline, but the test of economic reality views these elements as a whole, assigning primacy to no single one.' *Schulte v American Box Board Co,* 358 Mich 21, 33; 99 NW2d 367 (1959).

"See, also, *Tata v Muskovitz,* 354 Mich 695; 94 NW2d 71 (1959); *Askew v Macomber,* 398 Mich 212; 247 NW2d 288 (1976); *McKissic v Bodine,* 42 Mich App 203; 201 NW2d 333 (1972); *Nichol v Billot,* 406 Mich 284; 279 NW2d 761 (1979); *Solakis v Roberts,* 395 Mich 13; 233 NW2d 1 (1975); *Allossery v Employers Temporary Service, Inc,* 88 Mich App 496; 277 NW2d 340 (1979).

"The economic reality test looks to the employment situation in relation to the statutory scheme of workers' compensation law with the goal of preserving and securing the rights and privileges of all parties. No one factor is controlling."

In this case, the Court of Appeals utilized the economic reality test and reversed the trial court because

"[t]he evidence indicates that while Muskegon Firestone was a separate corporate entity at the time plaintiff's cause of action arose, its operation was the same as the other retail divisions. The local store branch managers belonged to a program whereby they participated in the store's profits or losses; they ordered inventory from defendant on consignment and purchased some items outside the company for resale. The other retail store and Muskegon Firestone were both listed in the local telephone directory as divisions of Firestone. All dollar accounting was handled by the central accounting office of defendant. Local store man-

agers did not issue company checks; they deposited all money in bank accounts in defendant's name. The local store managers received monthly profit and loss statements regarding their individual stores.

"Defendant calculated the expenses of each store in order to determine its annual operating profit or loss. Expenses charged to the stores included a percentage for worker's compensation insurance rates and other expenses attributable to payroll, rent, maintenance, etc.

"The evidence further indicated that the employees of Muskegon Firestone were under the supervision of defendant and subject to the rules and regulations thereof. The common practice, however, was for the local managers to do the hiring and firing. Certain of defendant's employees had the ability to hire and fire the local managers and could, if they chose, hire and fire other local employees. The local store manager acted within the framework of defendant's regulations. Employees of retail stores did not all belong to the same union as the employees of defendant. In fact, some retail personnel were unionized while others were not. In some cases, retail stores in an entire metropolitan area were organized in the same union regardless of whether they were separate corporations.

"Defendant's district supervisor, who testified that at the time of plaintiff's injury the employees of Muskegon Firestone were under his supervision and control, denied that retail store employees received different treatment depending on whether the store was a division or a separate corporation. In fact, all the retail employees were entitled to participate on the same basis in defendant's hospitalization and retirement benefit programs and other fringe benefits.

"Muskegon Firestone filed a separate corporate income tax return and issued its own W-2 forms to plaintiff and its other employees. However, all of these forms were processed at defendant's central tax department. Employees of Muskegon Firestone received paychecks from defendant through its central accounting office. Records of employment relating to plaintiff and other retail store employees were kept and administered by the personnel department of defendant Firestone.

"In balancing all of these factors for the purpose of applying the economic reality test, we find that defendant Firestone was plaintiff's employer within the meaning of the Worker's Disability Compensation Act of 1969. Therefore, the trial judge erred in refusing to grant defendant's motion for summary judgment on the ground that plaintiff's exclusive remedy is under the Worker's Disability Compensation Act." *Wells, supra,* pp 794-796.

Our balancing of those same factors persuades us that the Court of Appeals correctly applied the economic reality test to the facts of this case. However, further comment is warranted because the result, in effect, is a "reverse-piercing" of defendant's corporate veil.

We recognize the general principle that in Michigan separate entities will be respected. See *Klager v Robert Meyer Co,* 415 Mich 402; 329 NW2d 721 (1982), *Finley v Union Joint Stock Land Bank of Detroit,* 281 Mich 214; 274 NW2d 768 (1937), and *Gledhill v Fisher & Co,* 272 Mich 353; 262 NW 371 (1935).

However, the fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts. *Paul v University Motor Sales Co,* 283 Mich 587, 602; 278 NW 714 (1938). This of course means that, in general, even though Firestone is the parent company of Muskegon Firestone, its separate existence will be respected, unless doing so would subvert justice or cause a result that would be contrary to some other clearly overriding public policy. See, *e.g., Cinderella Theatre Co, Inc v United Detroit Theatres Corp,* 367 Mich 424; 116 NW2d 825 (1962).

Although traditionally the doctrine of "piercing the corporate veil" has been applied to protect a

corporation's creditors, or other outsiders, where the corporate entity has been used to avoid legal obligations, *People ex rel Attorney General v Michigan Bell Telephone Co,* 246 Mich 198; 224 NW 438 (1929), Michigan courts have recognized that it may be appropriate to invoke the doctrine for the benefit of a shareholder where the equities are compelling. See, *e.g., Montgomery v Central National Bank & Trust Co of Battle Creek,* 267 Mich 142; 255 NW 274 (1934).

Our disregard of the separate corporate entities of Firestone and its wholly owned subsidiary is premised upon our recognition of the important public policies underlying the Michigan Worker's Disability Compensation Act and our belief that a contrary determination would be inequitable under the facts of this case. The statutory workers' compensation scheme was enacted for the protection of both employees and employers who work and do business in this state. The system assures covered employees that they will be compensated in the event of employment-related injuries. In addition, employers are assured of the parameters of their liability for such injuries. By agreeing to assume responsibility for all employment-related injuries, employers protect themselves from the possibility of potentially excessive damage awards. In order to effectuate these policies, the statute has been liberally construed to provide broad coverage for injured workers. See, *e.g., Farrell v Dearborn Mfg Co, supra.*

If the statute is to be construed liberally when an employee seeks benefits, it should not be construed differently when the employer asserts it as a defense to a tort action brought by the employee who claimed and accepted benefits arising from that employment relationship. There is absolutely no evidence that defendant maintained Muskegon

Firestone for the purpose of insulating itself from its workers' compensation liabilities. Defendant supplied workers' compensation benefits through its insurance company and accepted responsibility for the work-related injuries of its Muskegon employees. Indeed, under the facts and circumstances of this case, we would not have permitted Firestone to shield itself behind its wholly owned subsidiary in order to avoid payment of workers' compensation benefits to plaintiff. *Cf. Williams v Lang (After Remand),* 415 Mich 179; 327 NW2d 240 (1982).

It is also significant that plaintiff did not rely upon the corporate distinction between Firestone and Muskegon Firestone. In fact, plaintiff disregarded this distinction when he asserted that Firestone was his employer for the purpose of obtaining workers' compensation payments. Plaintiff should not now be permitted to deny the relationship which he asserted and upon which Firestone relied in assuming responsibility for payment of workers' compensation benefits.

Plaintiff also argues that his cause of action is not barred by the exclusive remedy provision of the Worker's Disability Compensation Act because his injuries did not arise out of the employment relationship. He maintains that more than one type of relationship existed between himself and defendant at the time he was injured. We reject this attempt to apply the so-called "dual-capacity doctrine."[4]

---

[4] The Michigan Court of Appeals has rejected several dual capacity claims and found them insufficient to avoid the exclusive remedy provision in situations factually analogous to the instant case. See *Neal v Roura Iron Works, Inc,* 66 Mich App 273; 238 NW2d 837 (1975), *lv den* 396 Mich 841 (1976); *Peoples v Chrysler Corp,* 98 Mich App 277; 296 NW2d 237 (1980); *Bourassa v ATO Corp,* 113 Mich App 517; 317 NW2d 669 (1982), *lv den* 414 Mich 966 (1982); *Handley v Wyandotte Chemicals Corp,* 118 Mich App 423; 325 NW2d 447 (1982).

The dual-capacity doctrine recognizes that an employer can, under certain circumstances, occupy a status other than that of an employer with respect to his employee. See, *e.g., Mathis v Interstate Motor Freight System,* 408 Mich 164, 184; 289 NW2d 708 (1980). However, the doctrine is applicable only in those situations where the employer has a second identity which is completely distinct and removed from his status as employer.

This fundamental requirement for the application of the dual-capacity doctrine is set forth in 2A Larson, Workmen's Compensation Law, § 72.81, p 14-229:

"An employer may become a third person, vulnerable to tort suit by an employee, if—and only if—he possesses a second persona so completely independent from and unrelated to his status as employer that by established standards the law recognizes it as a separate legal person."

The great majority of American jurisdictions have held that an employer who manufactured the injury-causing device cannot be held liable to his employee under a products liability theory. *Id.,* § 72.83, p 14-239. Furthermore, the fact that the injury-causing product was also sold to the public is unimportant:

"What matters is that, *as to this employee,* the product was manufactured as an adjunct of the business, and furnished to him solely as an employee, not as a member of the consuming public. What the employer does with the rest of his output cannot change this central fact." *Id.,* § 72.83, p 14-246 (emphasis in original).

We conclude that plaintiff was employed by defendant and was injured while acting in the

course and within the scope of his employment. We affirm the judgment of the Court of Appeals.

WILLIAMS, C.J., and RYAN and BRICKLEY, JJ., concurred with CAVANAGH, J.

LEVIN, J. (*dissenting*). Wells, an employee of Muskegon Firestone Auto Supply and Service Stores, was injured in the course of employment by the explosion of a tire rim manufactured by Firestone Tire & Rubber Company. At the time of the accident, Firestone owned all the capital stock of Muskegon Firestone and substantially controlled its management and operations. The Court of Appeals in the application of an "economic reality test" determined that Firestone was Wells' employer within the meaning of the workers' compensation act, and that therefore Wells' products liability claim was barred by the exclusive remedy provision[1] of the workers' compensation act.[2]

## I

We would hold that "economic reality" is not determinative of the question which of the two separate corporations, parent or subsidiary, was Wells' actual employer for purposes of the exclusive remedy provision of the act. Applying general principles we conclude that Muskegon Firestone, and not Firestone, was Wells' employer, and therefore the exclusive remedy provision does not bar Wells' action against Firestone.

## A

Prior case law does not support the application

[1] MCL 418.131; MSA 17.237(131).

[2] *Wells v Firestone Tire & Rubber Co,* 97 Mich App 790; 296 NW2d 174 (1980).

of an economic reality test in this case. This Court in *Tata v Muskovitz,* 354 Mich 695; 94 NW2d 71 (1959), and *Nichol v Billot,* 406 Mich 284; 279 NW2d 761 (1979), did not, by applying a flexible approach to a limited aspect of workers' compensation law, make "economic reality" the touchstone for other workers' compensation determinations. In *Tata* this Court decided that the "control test" was an inappropriate measure for determining whether an injured worker was an independent contractor or an employee, who then would be entitled to workers' compensation benefits. In reasoning to that conclusion, this Court adopted the dissenting opinion of Justice TALBOT SMITH in *Powell v Employment Security Comm,* 345 Mich 455; 75 NW2d 874 (1956), which stated an "economic reality test."[3] In *Nichol,* a third-party tort action where the question again was whether a worker was an independent contractor or an employee, this Court applied an economic reality test. The Court said that, as compared to the control test, the economic reality test achieved "a freer and more realistic balancing of all the relevant factors in each case to determine which persons are properly denominated employees . . . [and] which persons should be properly denominated independent contractors."[4]

In *Funk v General Motors Corp,* 392 Mich 91; 220 NW2d 641 (1974), and *Dagenhardt v Special Machine & Engineering, Inc,* 418 Mich 520; 345 NW2d 164 (1984), this Court affirmed the general rule allowing an injured employee of a subcontractor to maintain a third-party action against the employer of the subcontractor. That general rule is not fully consistent with economic reality analy-

---

[3] The term "economic reality test" was, apparently, first used in *Solakis v Roberts,* 395 Mich 13, 25; 233 NW2d 1 (1975).

[4] *Nichol, supra,* p 298.

sis. An employee of a subcontractor—or the subcontractor himself if there are no other employees —pursues the goals of the employer of the subcontractor, is paid, at least indirectly, by the employer of the subcontractor and, questions of control aside, generally functions as an employee of the employer of the subcontractor.[5] On that basis, many states treat the employers of subcontractors as employers of the subcontractor's employees for purposes of the exclusive remedy provision.[6] Neither the Legislature nor this Court, however, has adopted this widely accepted, economically based rule.

The economic reality test is a substitute for the control test.[7] The control test is a means of characterizing an employment relationship, of determining whether the employment was of a subcontractor or of a servant. In the instant case, however, there is no employment relationship between Firestone and Muskegon Firestone. The issue here is not whether the control test should be abandoned and an economic reality test adopted. The control test has never been determinative of whether the corporate veil should be pierced or which member of a corporate family is the "actual" employer of a worker. The issue here is whether an economic reality test should be made determinative of whether parent and subsidiary corporations are a

---

[5] See, generally, *Dagenhardt, supra,* fn 47, p 559 (dissenting opinion of Levin, J.).

[6] See *Dagenhardt, supra,* p 557 (dissenting opinion of Levin, J.), citing 2A Larson, Workmen's Compensation Law, § 72.31(a), pp 14-111 ff.

[7] See *Tata, supra* (employee/independent contractor); *Schulte v American Box Board Co,* 358 Mich 21; 99 NW2d 367 (1959) (employee/independent contractor; Smith, J., *concurring,* applied economic reality test); *Goodchild v Erickson,* 375 Mich 289; 134 NW2d 191 (1965) (employer/broker); *Solakis,* fn 3 *supra* (dual employer); *Askew v Macomber,* 398 Mich 212; 247 NW2d 288 (1976) (employer/broker); *Nichol, supra* (employee/independent contractor); *Farrell v Dearborn Mfg Co,* 416 Mich 267; 330 NW2d 397 (1982) (dual employer/broker).

single entity; more specifically, of whether they are a single entity for the purposes of the exclusive remedy provision of the workers' compensation act.

## B

The vast majority of states do not extend the reach of the exclusive remedy provision of a workers' compensation act by treating parent and subsidiary corporations as a single entity. Courts in California, Colorado, Connecticut, Florida, Illinois, Kentucky, Maryland, Mississippi, Missouri, New Jersey, New York, North Carolina, Oklahoma, South Carolina, Tennessee, Texas and Washington, refused to treat dominant parent and servient subsidiary corporations as a single entity for this purpose.[8] The intermediate Georgia appellate

---

[8] *California: Gigax v Ralston Purina Co,* 136 Cal App 3d 591; 186 Cal Rptr 395 (1982). (The facts were disputed, it being unclear whether the plaintiff was an employee of a division of the defendant or of a subsidiary of the defendant. The court stated that the employee of a dominated subsidiary could sue the parent corporation on a products liability theory. The court also stated that an employee, injured while working for one *division* of a corporation could maintain an action based on a tort committed by a separate corporate *division* that was engaged in a separate enterprise. The court adopted an enterprise liability standard based on the "hard realities" of intracorporation organization. See Davis, *Workmen's compensation—Using an enterprise theory of employment to determine who is a third Party tort-feasor,* 32 U Pitt L R 289 [1971]).

*Colorado: Peterson v Trailways, Inc,* 555 F Supp 827 (D Colo, 1983). (Employees of wholly owned subsidiary sued parent for failure to provide safe workplace. This case contains a thorough discussion of the issue.) See also *Gaber v Franchise Service, Inc,* 680 P2d 1345 (Colo App, 1984).

*Connecticut: Gregory v Garrett Corp,* 578 F Supp 871 (SD NY, 1983). (Employee of parent sued subsidiary on products liability and negligence theories.)

*Florida: Gulfstream Land & Development Corp v Wilkerson,* 420 So 2d 587 (Fla, 1982). (Employee of wholly owned subsidiary sued parent as a property owner. Parent and subsidiary were insured under the same workers' compensation insurance policy.) *Gulfstream* overruled *Goldberg v Context Industries, Inc,* 362 So 2d 974 (Fla App, 1978).

*Illinois: McDaniel v Johns-Manville Sales Corp,* 487 F Supp 714

(ND Ill, 1978). (Employees of "various related companies" sued other related companies for injuries arising out of exposure to asbestos.)

*Kentucky: Boggs v Blue Diamond Coal Co,* 590 F2d 655 (CA 6, 1979). (Employees of wholly owned subsidiary sued parent for negligent performance of a safety maintenance contract. This is the most influential case on the issue.)

*Maryland: Thomas v Hycon, Inc,* 244 F Supp 151 (DC, 1965). (Employee of wholly owned subsidiary sued parent truck-owner for injuries occasioned by defective brakes. Parent and subsidiary had a joint workers' compensation insurance policy.) See also *Heinrich v Goodyear Tire & Rubber Co,* 532 F Supp 1348 (D Md, 1982).

*Mississippi: Index Drilling Co v Williams,* 242 Miss 775; 137 So 2d 525 (1962). (Employee of first wholly owned subsidiary brought action for negligence against second wholly owned subsidiary that was engaged in same line of work. Employee had received workers' compensation from a third wholly owned subsidiary, probably under a borrowed servant theory.)

*Missouri: Boswell v May Centers, Inc,* 669 SW2d 585 (Mo App, 1984). (Employee of parent sued subsidiary.)

*New Jersey: Mingin v Continental Can Co,* 171 NJ Super 148; 408 A2d 146 (1979). (Employee of one wholly owned subsidiary sued parent and second wholly owned subsidiary under a products liability theory. All corporations were insured under the same workers' compensation insurance policy.) See also *Lyon v Barrett,* 89 NJ 294; 445 A2d 1153 (1982).

*New York: Samaras v Gatx Leasing Corp,* 75 AD2d 890; 428 NYS2d 48 (1980). (Employee of subsidiary brought products liability action against parent.) See also *Thomas v Maigo Corp,* 37 AD2d 754; 323 NYS2d 106 (1971); *Daisernia v Co-Op GLF Holding Corp,* 26 AD2d 594; 270 NYS2d 542 (1966); *Foley v New York City Omnibus Corp,* 112 NYS2d 217 (1952).

*North Carolina: Phillips v Stowe Mills, Inc,* 5 NC App 150; 167 SE2d 817 (1969). (Employee of wholly owned subsidiary sued parent as building owner.)

*Oklahoma: Love v Flour Mills of America,* 647 F2d 1058 (CA 10, 1981). (Employee of wholly owned subsidiary sued parent. Court appeared ready to allow action, but held parent had violated no duty to this employee.)

*South Carolina: Brown v Moorhead Oil Co,* 239 SC 604; 124 SE2d 47 (1962). (Employee of uninsured, wholly owned subsidiary was not allowed to collect workers' compensation benefits from insured wholly owned subsidiary that was engaged in same work.)

*Tennessee: Latham v Technar, Inc,* 390 F Supp 1031 (ED Tenn, 1974). (Employee of wholly owned subsidiary sued parent for breach of a nondelegable duty concerning dangerous objects. Parent and subsidiary were insured by the same workers' compensation policy.)

*Texas: Stoddard v Ling-Temco-Vought, Inc,* 513 F Supp 314 (CD Cal, 1980). (Employee of subsidiary brought products liability and negligence actions against parent. Parent and subsidiary were covered by same workers' compensation policy.)

*Washington: Peterick v State,* 22 Wash App 163; 589 P2d 250

courts are split on the question.[9] Only in Louisiana is the employee of a subsidiary barred from bringing an action against the parent, but this appears to be mandated by a unique Louisiana statute.[10]

(1977). (Employee of 92%-owned subsidiary brought action against parent. *Held:* parent had violated no duty owed to this employee.)

[9] In *Harvey v Fine Products Co, Inc,* 156 Ga App 649; 275 SE2d 732 (1980), and *Beck v Flint Construction Co,* 154 Ga App 490; 268 SE2d 739 (1980), the Georgia appellate court barred actions against parent corporations brought by employees of subsidiaries. The court reasoned that the parent owed no duty to the employee unless the subsidiary was an "alter ego" of the parent. And if the subsidiary was an alter ego, then the parent was entitled to immunity to the same extent as the subsidiary.

*Beck* cites three cases to support its argument that the parent of an "alter ego" subsidiary enjoys immunity, but all are inapposite. In *Yancey v Green,* 129 Ga App 705; 201 SE2d 162 (1973), an employee of the board of education was barred from suing board members individually. In *Mull v Aetna Casualty & Surety Co,* 120 Ga App 791; 172 SE2d 147 (1969), an employee's action based on negligent inspection by the defendant insurer was barred because a Georgia statute protected insurers from such suits. The court stated that the insurer was the "alter ego" of the employer. In *Southern Wire & Iron, Inc v Fowler,* 217 Ga 727; 124 SE2d 738 (1962), the court would not allow an employee to sue his employer's president.

The cases rely on an alter ego theory that is not followed in Michigan. See fn 14.

A United States District Court applying Georgia law had reached a contrary result prior to *Beck* and *Harvey.* In *O'Brien v Grumman Corp,* 475 F Supp 284 (SD NY, 1979), the court rejected the defendant parent corporation's claim that the immunity of its subsidiary should protect it from suit by an employee of the subsidiary.

[10] In Louisiana, the employee of a subsidiary may not sue the parent corporation. This result, however, is mandated by statute. In *Braud v Dixie Machine Welding & Metal Works, Inc,* 423 So 2d 1243, 1245 (La App, 1982), the court noted that a statute prohibited an employee from suing a stockholder of his employer. That statute, La Rev Stat Ann, § 23:1032, provides:

"The rights and remedies herein granted to an employee or his dependent on account of an injury or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee . . . *against his employer,* or any *principal,* or any officer, director, *stockholder,* partner or employee of such employer or principal." (Emphasis added.)

In *Coco v Winston Industries, Inc,* 330 So 2d 649 (La App, 1975), an employee of a subsidiary was injured while he arguably was pursuing the business of the parent corporation. The employee sued the parent as principal. The court discussed "alter ego" immunity, but the decision rests on the above-mentioned statute. The discussion of alter

In this state, with the exception of the instant case, the cases uniformly suggest that an employee of a subsidiary corporation may maintain an action against the parent corporation.[11] In the similar situation in which an employee brings an action against the sole and individual shareholder of the employer corporation, the courts of this state have refused to extend the bar of the exclusive remedy protection by piercing the corporate veil.[12]

Economic reality analysis would destabilize workers' compensation and corporate law. The courts of this state generally respect the separateness of corporate entities, and pierce the corporate veil only to prevent fraud or injustice.[13] Total domination by a parent corporation of a subsidiary does not justify piercing the corporate veil. As this Court said in *Gledhill v Fisher & Co,* 272 Mich 353, 358; 262 NW 371 (1935):

ego status was necessary because, under the Louisiana statute, the defendant, as principal, would be immune only if it was engaged in the same business as the employer of the injured employee. By showing that the employee's employer *(i.e.,* the subsidiary) was merely the alter ego of the defendant principal *(i.e.,* the parent), the court proved that the defendant principal necessarily was engaged in the same business as the employee's employer. Therefore, the defendant principal was immune from suit by the employee. See also *Nichols v Uniroyal, Inc,* 399 So 2d 751 (La App, 1981).

[11] *Choate v Landis Tool Co,* 486 F Supp 774 (ED Mich, 1980) (parent corporation does not obtain immunity based on its subsidiary's immunity); *Rick v R L C Corp,* 535 F Supp 39 (ED Mich, 1981) (court suggests that parent does not obtain subsidiary's immunity, but court held that parent did not owe a duty to this particular employee); *Oliver v St Clair Metal Products Co,* 45 Mich App 242; 206 NW2d 444 (1973) (court treats parent and subsidiary as distinct entities).

[12] *Robards v Estate of Kantzler,* 98 Mich App 414; 296 NW2d 265 (1980) (court refuses to give shareholder the immunity of his wholly owned corporation); *Elliott v Smith,* 47 Mich App 236; 209 NW2d 425 (1973) (employee's survivors may not obtain workers' compensation benefits from sole proprietorship owned by sole shareholder of uninsured employer corporation).

[13] See *Klager v Robert Meyer Co,* 415 Mich 402; 329 NW2d 721 (1982); *Gledhill v Fisher & Co,* 272 Mich 353; 262 NW 371 (1935); *Belen v Dawson,* 52 Mich App 670; 217 NW2d 910 (1974).

"It is not enough that the subsidiary is so organized and controlled as to make it 'merely an instrumentality, conduit or adjunct' of its stockholders. It must further appear that to recognize their separate entities would aid in the consummation of a wrong."[14]

---

[14] See also *Klager*, fn 13 *supra*, p 411, and *Gottlieb v Arrow Door Co*, 364 Mich 450, 452; 110 NW2d 767 (1961). Three Michigan cases suggest that "domination" alone justifies piercing the corporate veil. But on close reading, it is clear that more than domination is necessary. In *People ex rel Attorney General v Michigan Bell Telephone Co*, 246 Mich 198, 204-205; 224 NW 438 (1929), the Court held that a Michigan corporation had been established by American Telephone and Telegraph Company "to avoid full investigation and control by the public utilities commission of the State to the injury of the public." The Court also observed that the Michigan corporation was no more separate from AT&T in "carrying on a telephone business than is the ordinary station agent engaged in conducting and carrying on the railroad business of his employer." The Court concluded: "Where a corporation is so organized and controlled and its affairs so conducted as to make it a mere instrumentality or agent or adjunct of another corporation, its separate existence as a distinct corporate entity will be ignored and the two corporations will be regarded in legal contemplation as one unit."

The only question presented in that case, however, was whether the Michigan company could claim a credit for the sum of money paid to AT&T for certain services, or whether the credit would be granted only according to AT&T's actual cost of providing the services. AT&T's domination over the Michigan company made the contract between them appear to be less than an arm's length transaction and, therefore, an inadequate way to determine the actual "costs" of providing the services and the resulting credit.

The controversy did not present the question of whether AT&T would be held liable for all the legal obligations of the Michigan corporation, and the opinion gives no indication that AT&T would be held liable.

In *Western Casualty & Surety Co v Birmingham Contracting Co*, 74 F Supp 200 (ED Mich, 1947), the court held that the corporation was *not* dominated by an individual shareholder as his alter ego, without explaining what type of domination would have been required to hold the shareholder personally liable for the corporation's debts. All the court said was that "[w]here, as here, a plaintiff claims an individual defendant [is] personally liable on an alter ego theory for debts of a corporation and partnership of which he is a stockholder and partner, and *plaintiff does not prove* that such defendant was the real recipient of the assets or income of either entity, nor that either entity was dominated or operated by him as his alter ego, such individual defendant is not personally liable for such debts." *Id.*, p 208 (emphasis added).

In *Shirley v Drackett Products Co*, 26 Mich App 644; 182 NW2d 726

The opinion of the Court would disregard the corporate forms of the entities solely because Firestone dominated or controlled its subsidiary.

Respecting the corporate forms in this case would not "aid in the consummation of a wrong." Rather, we would thereby honor the corporate structure established by Firestone. As the Court of Appeals for the Sixth Circuit said in a similar situation in *Boggs v Blue Diamond Coal Co,* 590 F2d 655, 662 (CA 6, 1979):

"[A] business enterprise has a range of choice in controlling its own corporate structure. But reciprocal obligations arise as a result of the choice it makes. The owners may take advantage of the benefits of dividing the business into separate corporate parts, but principles of reciprocity require that courts also recognize the separate identities of the enterprises when sued by an injured employee."[15]

(1970), the plaintiff was injured by a defective product manufactured by the defendant's parent corporation. Because the defendant subsidiary corporation distributed only the parent's products, and had no separate identity of its own, the Court of Appeals held that the subsidiary was liable for the parent's tort. In reaching this conclusion, the Court relied on *Bathory v Procter & Gamble Distributing Co,* 306 F2d 22 (CA 6, 1962), another case involving the distribution of a parent's products by a wholly owned and dominated subsidiary. In both cases, however, the courts were considering the retailers' immunity rule which protected distributors from liability for negligent manufacture in cases in which the distributors acquired the product for resale from a responsible manufacturer without knowledge of its danger. The *Bathory* court did not couch the issue in terms of piercing the corporate veil. Rather, the court argued that "[t]he reasons for the rule protecting a *retailer* or *distributor* from liability for negligence . . . do not exist in this case." *Id.,* p 29 (emphasis added). The *Bathory* court did not pierce the corporate veil; it merely held that in certain cases involving dominated corporations, the retailers' immunity rule would not apply. *Shirley* and *Bathory* applied an exception to the retailers' immunity rule and did not create a novel ground for piercing the corporate veil.

Significantly, no court has cited *Shirley* as authority for the proposition that the corporate veil can be pierced without a finding of misconduct. To the extent that *Shirley* does stand for this proposition, the case has been criticized. See Petrella, Comment: *Piercing the corporate veil in Michigan,* 61 U Det J Urb L 81 (1983).

[15] At least seven courts either cite or quote *Boggs* on this point. See

Economic reality analysis could be viewed as creating a new employment relationship between Wells and Firestone. So viewed, economic reality analysis overturns traditional concepts of consensual employment. In *Schulte v American Box Board Co,* 358 Mich 21, 24; 99 NW2d 367 (1959), this Court acknowledged that "the relationship of employer and employee, unless created by statute, is a contractual relationship." As applied until now, the economic reality test has not violated this principle, because the test has been used only to characterize existing contractual relationships. Here, however, the test would determine whether two seemingly separate parties are one entity. Economic reality would be used not to characterize a contractual relationship, but to eliminate a parent subsidiary relationship. It would, in the instant case, create a new, rather than characterize an existent, employment relationship.

In *Peterson v Trailways, Inc,* 555 F Supp 827, 831-832 (D Colo, 1983), a United States District Court analyzed this aspect of the Court of Appeals decision in this case, and, noting that the economic reality test was developed to decide the independent contractor/employee question in cases implicating coemployee or employer immunity, criticized the extension of the doctrine:

"Inasmuch as analysis of the employee independent contractor distinction assumes the existence of a consensual relationship among the relevant parties, *Wells'* extension of the 'economic reality test' to cases raising this initial question seems unwarranted. Thus adherence to the indicators of 'economic reality,' may well threaten the economic interests of the 'employee' since

*Gigax,* fn 8 *supra,* p 604; *Peterson,* fn 8 *supra,* p 833; *Gregory,* fn 8 *supra,* pp 886-887; *Gulfstream,* fn 8 *supra,* p 589; *Love,* fn 8 *supra,* p 1062; *Stoddard,* fn 8 *supra,* p 326; *Choate,* fn 11 *supra,* p 776. See also *Daisernia,* fn 8 *supra,* p 594.

his consent or agreement receive no conscious analysis, but are considered at best as a matter of implication."

The court supported this statement by quoting from Professor Larson's treatise on workers' compensation law:

"Compensation law . . . is a mutual arrangement between the employer and employee under which both give up and gain certain things. Since the rights to be adjusted are reciprocal rights between employer and employee, it is not only logical but mandatory to resort to the agreement between them to discover their relationship. To thrust upon a worker an employee status to which he has never consented would not ordinarily harm him in a vicarious liability suit by a stranger against his employer, but it might well deprive him of valuable rights under the compensation act, notably the right to sue his own employer for common-law damages."[16]

The application of the exclusive remedy provision becomes, under any concept of economic reality, "a matter of implication," and therefore subject to manipulation. Here, an employer argues that "economic reality" requires that a parent and subsidiary be treated as one entity, with the result that the parent is shielded from suit by the subsidiary's employee. In *Gigax v Ralston Purina Co,* 136 Cal App 3d 591; 186 Cal Rptr 395 (1982), in contrast, an employee sued his corporate employer alleging a tort committed by a *division* of that corporation other than the one for which the plaintiff worked. The court applied an analysis based on "substance" and "hard realities," and stated that such actions were not necessarily

---

[16] 1C Larson, fn 6 *supra,* § 47.10, p 8-233. Larson is also cited for this proposition in *Gregory,* fn 8 *supra,* p 876.

barred by the exclusive remedy provision and could be maintained in proper circumstances.[17]

The abolition of the corporate form "bright line" would unnecessarily complicate the compensation of workers' injuries. The original application of the economic reality test did not create substantial administrative problems because the test replaced the equally ambiguous control test,[18] and because the contracting provision of the workers' compensation act[19] made application of the test unnecessary in some cases. Here, however, a well-established, simple framework would be replaced by an amorphous "test" that provides courts with little guidance.

The concern expressed in *Askew v Macomber,* 398 Mich 212, 226; 247 NW2d 288 (1976) (WILLIAMS, J., *dissenting),* is on point:

"There is, however, an inherent difficulty in determining the 'economic realities' of a given employment relation. As our Court of Appeals aptly stated in *McKissic v Bodine,* 42 Mich App 203, 208; 201 NW2d 333 (1972), 'the problem with economic reality is that it is a conclusion, and it is not a test in the sense that there are any well-defined criteria upon which an objective determination can be based.' "

Justice TALBOT SMITH, in his influential dissent in *Powell, supra,* pp 471-474, emphasized the need for a standard with a "definite meaning." SMITH rejected the control test, in large part,[20] because it

---

[17] *Gigax, supra,* p 607. See also fn 8.

[18] See *Powell, supra,* pp 471-474 (dissenting opinion of SMITH, J.).

[19] MCL 418.171; MSA 17.237(171).

[20] The control test, which originally limited an employer's vicarious liability, was also inappropriate because workers' compensation involves different issues than tort law. Professor Larson explains:

"This tort liability arose out of detailed activities carried on by the servant, resulting in some kind of harm to a third person. The extent to which the employer had a right to control these detailed activities

"failed to achieve either uniformity or certainty."¹ He recognized that "[t]he administration of an act designed to relieve human want should not be made to depend upon our resolution of such verbal antics." The economic reality test has proved no more certain in its application than the control test, but with its "freer determination," it may be the lesser of two evils. We are not in this case faced with two evils. The traditional "corporate status" test[21] provides a certain, predictable test which permits parties to plan their affairs and courts to resolve disputes.

The workers' compensation act[22] gives no indication that the Legislature intended for the term "employer" to have other than its normal meaning or that the Legislature intended to grant parent corporations exclusive remedy protection. The Legislature could, of course, have done so. Workers' compensation legislation frequently accords protection to particular parties. In many states, employers of subcontractors are immunized from third-party liability.[23] In Louisiana, shareholders of an

was thus highly relevant to the question whether the employer ought to be legally liable for them." 1C Larson, fn 6 *supra,* § 43.42.

Workers' compensation, however, involves separate issues that make control irrelevant.

"[Workers'] compensation law is concerned not with injuries *by* the employee in his detailed activities, but with injuries *to* him as a result not only of his own activities (controlled by the employer as to details) but of those of co-employees, independent contractors and other third persons (some controlled by the employer, and others not). To this issue, the right of control of details of his work has no such direct relation as it has to the issue of vicarious tort liability." 1C Larson, fn 6 *supra,* § 43.42.

See also *Nichol, supra,* p 296; *Powell, supra,* pp 467-469 (dissenting opinion of Smith, J.).

[21] See *Peterson, supra,* p 832.

[22] The 1952 amendment that provides the basis for this third-party action (1952 PA 155, now MCL 418.827; MSA 17.237[827]) and the exclusive remedy provision (MCL 418.131; MSA 17.237[131]) are of central importance to this analysis.

[23] See fn 6.

employer corporation are protected by the exclusive remedy provision.[24] In this state, the Legislature immunized insurance inspectors.[25] There is no reason to suppose that the Legislature intended, but simply neglected, to provide express protection for parent corporations in Firestone's position.[26] We would not infer such an intent and thereby deprive Wells of his common-law action. As stated by Professor Larson:

"[T]here is no strong reason of compensation policy for destroying common law rights . . . [and] every presumption should be on the side of preserving those rights, once basic compensation protection has been assured."[27]

C

This Court should not bar Wells from relying on the separate corporate forms of the parent and the subsidiary on the basis that he chose to disregard those forms when applying for workers' compensation payments. The record does not reveal why Wells listed Firestone as his employer.[28] Firestone has *not* claimed that Wells waived his third-party

[24] See fn 8.

[25] 1969 PA 317, amending MCL 418.131; MSA 17.237(131).

[26] Unlike the independent contractor/employee and employer/broker questions which have been considered by this Court on numerous occasions (see fn 7), there are no inherent ambiguities in the determination involved in this case. The Legislature could readily have extended exclusive remedy protection to the parent of a wholly owned subsidiary insured under the same workers' compensation policy as the parent.

[27] Larson, fn 6 *supra,* § 72.50, p 14-95. Larson is quoted on this point by *Boggs,* fn 8 *supra,* p 660, and *Choate,* fn 11 *supra,* p 776.

[28] Wells may have been urged to so file his claim by Muskegon Firestone, or he simply may have erred. Muskegon Firestone also listed Firestone as Wells' employer. Muskegon Firestone may have done so because Firestone carried the workers' compensation insurance for both corporations and was therefore more likely to be involved in the administration of compensation payments. Wells and Muskegon Firestone may both have been more concerned with com-

claim by listing Firestone as his employer. The question whether Wells did thereby waive his third-party claim is a question of fact, and not of law, which must first be raised before and decided by the WCAB.

## D

We would follow the vast majority of jurisdictions and hold that economic reality is not a basis for piercing the corporate veil. The economic reality test was devised to avoid inappropriate use of the control test, but that concern is not relevant here since control alone is not determinative of whether the corporate veil should be pierced, or which member of a corporate family employs a worker. The question whether there is an employment relationship between Firestone and Wells should be resolved by consent and not by implication. Applying the economic reality test in this context would permit corporations to avoid the reciprocal obligations inherent in their choice of corporate structure and would deny employees of many subsidiary corporations of the right they undoubtedly had, at the time the Legislature authorized third-party actions by employees who had received workers' compensation benefits, to maintain a third-party action.

## II

The disposition which we believe to be correct

pleting the paperwork and with initiating payment than with observing the formalities.

At any rate, these representations are not necessarily controlling. At the time of the accident, Wells was an employee of Muskegon Firestone. The subsequent representations would not operate retroactively to eliminate this employment relationship or to create a new one with Firestone. It does not appear that Wells' representation misled Firestone in such a manner that it is now necessary to disregard the corporate form to secure justice. Firestone has not alleged that Wells acted in bad faith.

makes it unnecessary to consider the dual capacity question. In this connection we note that the opinion of the Court extends the bar of the exclusive remedy provision by disregarding corporate forms in determining which of two separate entities is the "real" employer, but nevertheless treats the form as unimpeachable for the purpose of deciding whether the bar of the exclusive remedy provision applies where it is alleged that the employer is acting in a dual capacity.

The opinion of this Court may go further than is necessary to preserve the policy of the exclusive remedy provision. In the instant case, a customer of Muskegon Firestone supplied the defective Firestone product. Suppose a Firestone or Muskegon Firestone employee was injured in the course of employment as a consequence of the blowout of a Firestone tire on a rented automobile. It is questionable whether the bar of the exclusive remedy provision should preclude maintenance of a products liability action against Firestone.

This Court has recognized that the bar of the exclusive remedy provision may be superseded by other statutory policies.[29] The products liability statute[30] provides statutory authority for a products liability action, and suggests an inquiry whether the Legislature intended that a products liability action be barred by the exclusive remedy provision.

KAVANAGH and BOYLE, JJ., concurred with LEVIN, J.

---

[29] See *Mathis v Interstate Motor Freight System*, 408 Mich 164; 289 NW2d 708 (1980) (no-fault automobile insurance benefits); *Boscaglia v Michigan Bell Telephone Co*, 420 Mich 308; 362 NW2d 642 (1984) (sexual/ethnic discrimination). See also 2 Larson, *supra*, § 68.10, p 13-1 (intentional torts).

[30] MCL 600.2945 *et seq.;* MSA 27A.2945 *et seq.*