Wendy **GLOCKZIN, Individually and Independent Personal Representative of the Estate of Jeffrey Glockzin, Plaintiff,**

v.

**NORTEK, INC., and Nordyne, Inc., jointly and severally, Defendants.**

No. 1:90–CV–349.

United States District Court, W.D. Michigan, S.D.

March 20, 1992.

Douglas M. Hughes, Vander Ploeg, Ruck, Luyendyk & Wells, Muskegon, MI, for plaintiffs.

Evan L. MacFarlane, Robert E. Attmore, Cholette, Perkins & Buchanan, Grand Rapids, MI, for defendants.

### OPINION

ROBERT HOLMES BELL, District Judge.

This is a wrongful death action. Defendants move for summary judgment. For the

reasons that follow, the motion is GRANTED and this action is DISMISSED.

## I. BACKGROUND

The material facts of this tragic case are undisputed.

Jeffrey Glockzin ("decedent") was an employee of defendant Nordyne, Inc. ("Nordyne")[1], which manufactured heating and air conditioning units in Holland, Michigan. From time to time, as part of his assigned duties at work, the decedent was asked to fill in for an absent employee at an air conditioning assembly line.

The fateful day of April 20, 1988 was such an occasion. The regular assembly tester had called in sick, and a replacement was needed that day. Familiar with the job of an assembly tester, the decedent was asked to fill in for the absent employee.

As a substitute assembly tester, the decedent's task was seemingly straightforward. Working near the end of the assembly line, the decedent had to turn on—with the aid of a testing apparatus, called "the assembly tester"—the assembled air conditioning units to make sure that they energized satisfactorily.

This task required care, however. The testing apparatus sometimes generated minor electrical shocks. And the employees using the apparatus periodically felt these shocks.

While the shocks had hardly been life-threatening, the employees reported the shocks to the management of Nordyne. The management checked the apparatus and made appropriate corrections. The management further advised the employees to exercise caution when they used the testing apparatus.

Indeed, the employees followed a number of steps to forestall the possibility of receiving such minor shocks. They first took the apparatus's two wire leads with bare metal alligator-type clips and attached one to each side of the air conditioning unit. They then turned on a "toggle switch," which energized the air conditioning unit. They thereafter monitored the gauges on the air conditioning unit to ensure that it was performing properly. Upon such determination, they shut off the toggle switch and removed the wire leads.

Having previously worked as a substitute assembly tester, the decedent was familiar with these procedures. In fact, he knew—perhaps better than many—the importance of adhering to the proper procedures: At one time, while operating the apparatus, he himself received a shock from it, making him numb and requiring him to rest for a while.

On April 20, 1988, however, something seriously went wrong. While checking one of the air conditioning units, the decedent grabbed both alligator clips with his bare hands at the same time. He believed that the testing apparatus's toggle switch, which had not been marked, was turned off. The decedent thus thought that it was safe to handle the "live" electric clips. He was mistaken. The decedent received a 240-volt electric jolt, causing his death.

This wrongful death action followed. In the diversity complaint, the plaintiff alleges that on April 20, 1988, defendants Nordyne and Nortek, Inc.[2] committed an intentional

---

1. Nordyne is a wholly-owned subsidiary of defendant Nortek, Inc. ("Nortek").

2. It should be noted that when the plaintiff commenced this action, she alleged in the complaint that both Nordyne and Nortek, as a parent corporation of Nordyne, were liable under the intentional tort theory. To be sure, in her initial opposition brief to defendants' motion for summary judgment, she treated the two defendants as one, attributing the alleged tortious conduct of Nordyne to Nortek. Defendants did not disagree with the plaintiff's characterization of the two entities at that time. This Court then heard oral arguments on the defendants' motion, where the plaintiff continued to advance the same theory. Upon hearing the arguments, the Court found that the plaintiff's evidence in support of her case was meager. The Court therefore allowed the plaintiff to continue the discovery further, in anticipation of gathering more supporting evidence as to the intentional tort theory. Subsequently, the plaintiff submitted the fruits of her further discovery in a supplemental brief in opposition to summary judgment. Plaintiff, however, also advanced a new and unrelated theory that Nordyne and Nortek were now different entities for purposes of this motion and that, even if the motion were to be granted in favor of Nordyne, the motion should not be granted as to

tort by knowingly assigning the decedent to work with a defective testing apparatus which was certain to result in an electrocution injury.

## II. DISCUSSION

Defendants now move for summary judgment. They argue that there is no evidence to support an intentional tort claim against them here. For the reasons that follow, the Court agrees.

### A. Summary judgment standard

■ Summary judgment is appropriate when there is no genuine issue to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. At the same time, however, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Summary judgment is thus warranted when the nonmoving party has no evidentiary support for an essential element on which it bears the burden of proof. *Id.* at 322–23, 106 S.Ct. at 2552–53.

### B. Intentional tort exception to Michigan Worker's Disability Compensation Act

■ The applicable substantive law is clear. Under Michigan law, the right to recover benefits under the Worker's Disability Compensation Act is the exclusive remedy of an employee against an employer for personal injury or occupational disease. M.C.L. § 418.131; M.S.A. § 17.237(131); *Adams v. Shepherd Products, U.S., Inc.*, 187 Mich.App. 695, 696, 468 N.W.2d 332 (1991). There is, however, a narrow exception. The statute expressly provides that the exclusive remedy provision does not apply to claims arising from intentional torts. *Id.* The statute further states that

> [a]n intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge.

M.C.L. § 418.131(1); M.S.A. § 17.-237(131)(1).

In interpreting this statutory provision, one Michigan appellate court recently explained that the exception "can only mean that plaintiff must be able to allege a specific danger known to the employer that is certain to result in an injury and that the employer required the plaintiff to work in the face of such danger." *McNees v. Cedar Springs Stamping Co.*, 184 Mich.App. 101, 105, 457 N.W.2d 68 (1990), *app. denied*, 437 Mich. 925 (1991). That court further stated that to fall under the exception, the alleged tort must be

defendant-corporate parent Nortek. Plaintiff argued that there were differences in the two entities' capacities.

In this Court's view, the plaintiff's about-face at this juncture is questionable. As a preliminary matter, the plaintiff never alleged this "dual capacity doctrine," pursuant to *Wells v. Firestone Tire & Rubber Co.*, 421 Mich. 641, 364 N.W.2d 670 (1984), in the complaint or in any other subsequent submissions except in her latest supplemental submission. Indeed, it appears that the plaintiff has submitted this new theory as an afterthought. But more importantly, the plaintiff has failed to allege any new theory of liability

under which Nortek may now be found liable. Plaintiff has only alleged that Nortek and Nordyne are different under the plaintiff's "economic reality test." Thus, even if Nordyne and Nortek are indeed different entities, precluding summary judgment in favor of Nortek, the Court is hard pressed to find a reason to retain Nortek as a defendant under the plaintiff's new arguments, since there is no theory of liability. Accordingly, because of the dubious nature of the plaintiff's new contention, the Court will continue to proceed, for purposes of this motion, as if Nordyne and Nortek are indistinguishable entities.

more than "mere negligence or even gross negligence. It is wilfully forcing an employee to work in the face of a known and certain danger with respect to the specific machine that caused the accident." *Id.* 184 Mich.App. at 106, 457 N.W.2d 68.

■ Here, the plaintiff relies on this intentional tort exception to advance her wrongful death action. Plaintiff, however, has failed to establish an essential element of this exception to withstand this summary judgment motion. Plaintiff has not come forward with evidentiary support indicating that there was *certain* danger—here, the danger of electrocution—with respect to the testing apparatus that caused the accident.

To begin the analysis, there is little doubt that the working environment of Nordyne's assembly line, particularly with respect to the assembly tester's station, was imperfect. A review of the evidentiary submissions reveals that there was, perhaps, a litany of problems. To list some: There was no marking on the apparatus's toggle switch to indicate whether the switch had been turned on or not. (*See* Brief in Support of Defendants' Motion for Summary Judgment at 12). There were no protective rubber mats on the floor underneath the apparatus. (*Id.*). There was a rumor that the circuit breaker on the apparatus had been disabled. (*Id.* at 13). And maybe, in hindsight, there should have been large "jumper cable" type clips with 75 amp capacity and rubber insulated connectors on the apparatus. (*See* Plaintiff's Supplemental Brief in Opposition to Defendants' Motion for Summary Disposition at 1; Affidavit of Theodore Gilman at 2). Indeed, a number of employees working as an assembly tester received minor shocks from the testing apparatus, (*see* Brief in Support of Defendants' Motion for Summary Judgment

at 12), and the Michigan Department of Labor, upon investigation after the decedent's death, found some National Electrical Code violations for the apparatus and the work station. (*Id.* at 5).

But accepting these evidentiary submissions as true does not make this negligence-like action into an intentional tort case. The plaintiff's submissions simply do not produce the "accumulative effect" that the defendants committed an intentional tort. (Plaintiff's Supplemental Brief in Opposition to Defendants' Motion for Summary Disposition at 1). Rather, contrary to the plaintiff's expert's assertion, there is no evidence that the defendants "expose[d] the operator [the decedent] to *certain* electrocution." (Affidavit of Matthew S. Mashikian at 2) (emphasis in original).[3]

The undisputed evidence compels no other conclusion. Though a number of employees had received shocks from the apparatus, there is no evidence that anyone, except for the decedent, suffered a similar electrocution. All of those employees who previously received the shocks suffered no more than a transient physical buzz or numbing. (*See* Deposition testimony of Jimmy R. Bryson ("Bryson Depo.") at 31; Deposition testimony of James Kendra at 25–26). Of course, these minor incidents occurred over a period where there was a continuous, daily use of the apparatus at a busy manufacturing assembly line. Given these circumstances, then, an electrocution could not have been envisioned as a certain danger.

Moreover, it is undisputed that the Nordyne's management, once aware of the apparatus's problem, took measures, however effective they may have been, to repair the apparatus. (*See* Bryson Depo. at 35, 37). Nordyne's management also took another

---

**3.** Plaintiff's expert, an electrical engineer, suggests that upon examining the testing apparatus, he found it faulty. He therefore concludes that an operator of the testing apparatus was subjected to *"certain* electrocution." (Exhibit B to Plaintiff's Supplemental Brief in Opposition to Defendant's Motion for Summary Disposition at 2) (emphasis in original). Though this Court will not quarrel with the expert's assessment on the apparatus's design and construction, it nonetheless finds the expert's conclusion problematic. Upon reviewing the evidence relied on by the expert (*see id.* at 1–3), the Court observes no

basis for the expert's conclusion regarding the certainty of electrocution. True, there may have been serious technical problems with the apparatus, but the expert fails to explain how an electrocution was *certain to occur* on any particular occasion. In this Court's view, the expert merely states that: (1) there were a variety of problems with the apparatus; and (2) those problems *could* lead to a serious accident occurring in the future. As explained in the text above, the Michigan Workers' Disability Compensation Act statute requires more for its intentional tort exception.

safety measure: warning the employees of the possibility of shocks. (Bryson Depo. at 32). If anything, these remedial measures would have diminished the likelihood of any future electrical shocks. These measures would not have made an electrocution a certainty.

To be sure, there was a risk of an injury arising from the use of the testing apparatus. Some, such as the plaintiff's expert, may even assert that the risk was quite high because the apparatus was defectively designed and built. However, given the record presented here, including the pleadings, briefs, affidavits, and deposition testimony of Bryson and Kendra, there is simply no evidence indicating that the electrocution injury was *certain to occur* at Nordyne's manufacturing plant in Holland, Michigan on April 20, 1988. The Court needs to go no further.

## III. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is hereby GRANTED. This action is therefore DISMISSED.