*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EMILY SCHENK,

        Plaintiff-Appellee,

v

JUDITH HODGE, also known as JUDITH HODGES, also known as JUDITH SHACKELFORD-HODGE,

        Defendant/Cross-Plaintiff,

and

MARC LOUIS ABDILLA and HURON VALLEY AMBULANCE, INC.,

        Defendants/Cross-Defendants-
        Appellants,

and

CHARTER TOWNSHIP OF VAN BUREN,

        Defendant-Appellant,

and

AMERICAN ALTERNATIVE INSURANCE CORPORATION,

        Defendant.

UNPUBLISHED
August 20, 2025
1:35 PM

Nos. 367834; 367940
Wayne Circuit Court
LC No. 19-009820-NI

ROBERT RAYMOND REED and REGINA MARIE REED,

        Plaintiffs-Appellees,

v                                                    Nos. 367842; 367939
                                                     Wayne Circuit Court
JUDITH SHACKELFORD-HODGE,                            LC No. 19-017359-NI

              Defendant,
and

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

              Defendant/Cross-Plaintiff,
and

MARC LOUIS ABDILLA, HURON VALLEY
AMBULANCE, INC., and CHARTER TOWNSHIP
OF VAN BUREN,

              Defendants-Appellants,
and

AMERICAN ALTERNATIVE INSURANCE
CORPORATION,

              Defendant/Cross-Defendant.

_____

Before: BORRELLO, P.J., and M. J. KELLY and TREBILCOCK , JJ.

PER CURIAM.

       This matter involves consolidated appeals.[1]   In Docket Nos. 367834 and 367842, defendants, Marc Abdilla, Huron Valley Ambulance, Inc. (HVA), and Van Buren Charter Township, appeal as of right the trial court's order denying their motion for summary disposition under MCR 2.116(C)(7).   In those appeals, defendants contend that the claims brought by plaintiffs, Robert Reed, Regina Reed, and Emily Schenk, are barred by the immunity provisions of the Governmental Tort Liability Act (GTLA), MCL 691.1401 *et seq*.  In Docket Nos. 367940 and 367939, defendants appeal by leave granted[2] the same order on additional grounds involving

_____

[1] *Schenk v Hodge*, unpublished order of the Court of Appeals, entered January 26, 2024 (Docket No. 367940); *Reed v Abdilla*, unpublished order of the Court of Appeals, entered January 26, 2024 (Docket No. 367939).

[2] *Reed v Abdilla*, unpublished order of the Court of Appeals, entered January 26, 2024 (Docket No. 367939); *Schenk v Hodge*, unpublished order of the Court of Appeals, entered January 26, 2024 (Docket No. 367940).

negligence; the Emergency Medical Services Act (EMSA), MCL 333.20901 *et seq*.; and the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq*. For the reasons stated in this opinion, we reverse and remand.[3]

## I. BASIC FACTS

This action arises out of a motor-vehicle crash that occurred in the afternoon of January 4, 2019, at the intersection of Haggerty Road and Ecorse Road in Van Buren Township. One of the vehicles was an ambulance owned by HVA and driven by Abdilla, who was an employee of the Van Buren Township Fire Department. Abdilla was driving the ambulance while plaintiffs Schenk and Robert Reed were providing care to a critically ill patient who was being transported to a nearby hospital. The ambulance was traveling northbound on Haggerty Road with its lights and sirens activated. As Abdilla approached the intersection of Haggerty Road and Ecorse Road, the light facing him turned red. Abdilla slowed, but did not stop. As he proceeded through the intersection, Judith Shackelford-Hodge, who had failed to hear the sirens or see the lights on the ambulance, accelerated through the intersection and crashed into the rear of the ambulance. The impact knocked the ambulance onto its side. Both Schenk and Robert Reed sustained injuries as a result of the crash.

Schenk and the Reeds filed complaints against defendants, alleging multiple negligence-based claims. HVA moved for summary disposition in both cases, alleging that the trial court lacked subject-matter jurisdiction in light of the exclusive-remedy provision of the WDCA. In response, Schenk and Robert Reed argued that they were employed by HVA's parent company, Emergent Health Partners (EHP), not HVA. The trial court disagreed and granted HVA's motions in both cases. Plaintiffs appealed in this Court, which reversed and remanded for further proceedings. *Reed v Hodge*, unpublished per curiam opinion of the Court of Appeals, issued November 4, 2021 (Docket Nos. 353245 and 354038), pp 2, 4, 6-8. On remand, discovery continued on both cases, which were eventually consolidated by the trial court.

Thereafter, defendants moved for summary disposition under MCR 2.116(C)(7) and MCR 2.116(C)(10), arguing that plaintiffs' claims were barred by the GTLA and the EMSA. They additionally argued that plaintiffs' claims against HVA were precluded by the exclusive remedy provision of the WDCA. Finally, they contended that, as a matter of law, they were not negligent. Following a hearing, the trial court denied their motion. These consolidated appeals follow.

---

[3] These consolidated appeals arise from two separate lower court actions involving a single motor vehicle crash. Judith Shackelford-Hodge, American Alternative Insurance Corporation, and State Farm Mutual Automobile Insurance Company are not participating in these appeals. Accordingly, for ease of reference we will refer to Abdilla, HVA, and the Township, collectively, as "defendants." Further, we will refer to Schenk, Robert, and Regina, collectively, as "plaintiffs."

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Defendants argue that the trial court erred by denying their motions for summary disposition. "We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "Summary disposition under MCR 2.116(C)(7) is appropriate if a claim is barred because of immunity granted by law." *Pike v Northern Mich Univ*, 327 Mich App 683, 690; 935 NW2d 86 (2019). When reviewing a motion under MCR 2.116(C)(7), "we consider all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them." *Krieger v Dep't of Environment, Great Lakes, & Energy*, 348 Mich App 156, 170; 17 NW3d 700 (2023) (quotation marks and citation omitted). "[I]f no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court." *Id*. at 171 (quotation marks and citation omitted). Motions brought under MCR 2.116(C)(10) test "the factual sufficiency of a claim." *Wilmore-Moody v Zakir*, 511 Mich 76, 82; 999 NW2d 1 (2023). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil*, 504 Mich at 160. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id* (quotation marks and citation omitted). "The application of governmental immunity is a question of law subject to de novo review." *Yoches v Dearborn*, 320 Mich App 461, 469; 904 NW2d 887 (2017).

### B. ANALYSIS

#### 1. GOVERNMENTAL FUNCTION VS PROPRIETARY FUNCTION

"Under the GTLA, governmental agencies and their employees are generally immune from tort liability when they are engaged in the exercise or discharge of a governmental function." *Ray v Swager*, 501 Mich 52, 62; 903 NW2d 366 (2017); see also MCL 691.1407(a). On appeal, plaintiffs suggest that the Township was not engaged in a governmental function. In support, they direct this Court to *Berkowski v Hall*, 91 Mich App 1; 282 NW2d 813 (1979). That case, however is not binding. See MCR 7.215(J)(1). Moreover, the *Berkowski* Court relied upon *Parker v Highland Park*, 404 Mich 183; 273 NW2d 413 (1978), which adopted the governmental-essences test; however, *Parker*'s approach was subsequently rejected by our Supreme Court in *Ross v Consumers Power Co*, 420 Mich 567; 363 NW2d 641 (1984). In *Ross*, the Supreme Court held that "a governmental function is an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law." *Ross*, 420 Mich at 620. That definition was later codified by the Legislature in MCL 691.1401(b). Given that there is a statutory definition expressly defining what constitutes a governmental function and given that the caselaw relied upon by plaintiffs has been superseded by both caselaw and statute, we do not find *Berkowski* to be persuasive and we decline to apply the governmental-essence test to determine whether the provision of ambulance services is a governmental function.

-4-

As defined in MCL 691.1401(b), a governmental function is statutorily defined as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1401(b). The operation of an ambulance service through a township's fire department is expressly permitted by statute. See MCL 41.806(1)(a) (permitting townships to establish and maintain a fire department); MCL 41.711 (authorizing a township to operate an ambulance service in connection with their fire protection service and permitting the services to be provided by contract between the township and an individual, firm, organization, or corporation). As such, the provision of ambulance services in this case is a governmental function.

Plaintiffs, however, assert that the proprietary-function exception to governmental immunity applies to its claim against the Township. The proprietary-function exception provides:

> The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees. [MCL 691.1413.]

"Therefore, to be a proprietary function, an activity: (1) must be conducted primarily for the purpose of producing a pecuniary profit; and (2) it cannot be normally supported by taxes and fees." *Goodhue v Dep't of Transp*, 319 Mich App 526, 532; 904 NW2d 203 (2017) (quotation marks and citations omitted).

Plaintiffs contend that the Township was engaged in a proprietary function because it entered into a service agreement with HVA regarding the provision of the Township's ambulance services. That agreement required HVA to provide ambulance services staffed by at least two HVA employees. However, HVA could request that a Township employee drive an HVA ambulance if it was necessary for the HVA employees to administer medical services to patients in the back of the ambulance. Plaintiffs address the first prong of the proprietary-function test by claiming that the Township's "clear purpose" in allowing its employees to operate HVA's ambulances in this manner was to "reduce costs," and "create profit" under the service agreement. They contend is that the Township would have incurred greater costs if HVA had to staff its ambulances with three HVA employees.

The record does not support that assertion. Under the express language of the service agreement, the Township was not required to pay for any of the services provided by HVA. Instead, HVA had to collect payment "directly from those individuals to whom they are provided, or appropriate third party payers." There is no language indicating that, but for the provisions related to the staffing requirements, the Township would have had to pay HVA for its ambulance services. Plaintiffs' beliefs that the clear purpose of the staffing provisions is to create a profit for the Township, therefore, amounts to nothing more than speculation, which is insufficient to establish a genuine issue of material fact. See *McNeill-Marks v MidMichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016).

Additionally, plaintiffs have not provided any evidence or argument as to whether the provision of ambulance services "cannot be normally supported by taxes and fees." *Goodhue*, 319 Mich App at 532. This requirement must be met in order for a function to qualify as a proprietary function. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Because no argument was presented on this portion of the proprietary-function test, the issue is abandoned.[4]

Because the Township was engaged in a governmental function, not a proprietary function, governmental immunity bars plaintiffs from suing it in tort on any ground relating to the ambulance services. MCL 691.1407(1). The trial court, therefore, erred to the extent that it denied summary disposition to the Township on the basis of governmental immunity.

## 2. GROSS NEGLIGENCE

Next, plaintiffs contend that Abdilla is not immune from liability because his actions in operating the ambulance were grossly negligent. Under MCL 691.1407(2):

> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

Plaintiffs first argue that the Township was not engaged in the exercise of a governmental function under MCL 691.1407(2)(b). However, as noted above, MCL 691.1401(b) defines governmental function as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." And as previously discussed, the provision of ambulatory services through a fire department—including the provision of such services via a contract entered into between the Township and a third party—is a governmental

---

[4] Regardless, payment for ambulance services may be provided through state, federal, or private funds. MCL 333.20948(1). As such, it seems clear that this is the type of services that *can* normally be supported through taxes and fees.

function under this definition. The Township was therefore engaged in a governmental function at the time of the accident for purposes of MCL 691.1407(2)(b).

Next, we must consider whether Abdilla's actions amounted to gross negligence. The GTLA defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). "Evidence of ordinary negligence is not enough to establish a material question of fact regarding whether a government employee was grossly negligent." *Chelsea Investment Group LLC v Chelsea*, 288 Mich App 239, 265; 792 NW2d 781 (2010). "Moreover, simply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Wood v Detroit*, 323 Mich App 416, 424; 917 NW2d 709 (2018) (quotation marks, citation, and alteration omitted). Rather, "[g]ross negligence suggests almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Dougherty*, 340 Mich App at 350 (quotation marks and citation omitted).

Here, when Abdilla approached the intersection, the ambulance's sirens and lights were activated. The traffic light facing Abdilla turned red, while the traffic light facing Hodge turned green. A semitruck was stopped in the first position of the through lane of Ecorse Road. At that time, Abdilla was driving below the speed limit. Abdilla testified that he knew drivers occasionally proceeded through the intersection from the curbside lane of Ecorse Road, and he saw a vehicle drive behind the semitruck and out of his sight. As a result Abdilla paid particular attention to the area surrounding the semitruck, slowed the ambulance down, and did not increase his speed again until he saw the white SUV cross the intersection in front of him. Abdilla further testified that he had not seen any other vehicles to his right or left after the white SUV drove through the intersection. He, therefore, believed the intersection was clear and began accelerating so that he could get out of the intersection.

Abdilla never came to a full stop at any point while traveling through the intersection. Data collected from the ambulance after the crash reveals that, in the five seconds before the collision, Abdilla reduced the speed of the ambulance to just under 50 percent. He then began accelerating again about two-and-a-half seconds before the crash. At the time of the crash, he had increased the ambulance's speed from 18 miles per hour to 23.6 miles per hour. Surveillance footage of the incident generally demonstrates that Abdilla was already approaching or within the intersection during the relevant timeframe.

Making all legitimate inferences in favor of plaintiffs, as the nonmoving party, *Anderson*, 341 Mich App at 507, one could infer that Abdilla began accelerating before he could see completely around the semitruck to confirm that no other vehicles were approaching. However, plaintiffs have not provided any evidence contradicting Abdilla's testimony that he thought the intersection was clear at that point. Rather, plaintiffs essentially argue that he could not have known whether the lane was clear, so he acted in a grossly negligent manner by accelerating through the lane instead of stopping. However, considering that Abdilla slowed down in the intersection in an attempt to avoid the possibility of a collision, albeit with a different vehicle, an objective observer could not reasonably conclude that Abdilla demonstrated "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Dougherty*, 340 Mich App at 350 (quotation marks and citations omitted).

In an effort to demonstrate gross negligence, plaintiffs presented evidence that Abdilla's decision to proceed through the intersection without stopping violated national safety standards. However, such evidence is only demonstrative of ordinary negligence. See, e.g., *Maiden v Rozwood*, 461 Mich 109, 124-128; 597 NW2d 817 (1999) (concluding that the plaintiffs' proofs, including evidence that a staff member may have used an unapproved restraint technique when physically restraining the plaintiff, failed to raise a material question regarding gross negligence, rather than ordinary negligence, under the circumstances); *Rakowski v Sarb*, 269 Mich App 619, 623, 635-636; 713 NW2d 787 (2006) (stating that evidence a ramp was constructed in violation of construction standards and the national building code demonstrated only ordinary negligence, not gross negligence). Again, "[e]vidence of ordinary negligence is not enough to establish a material question of fact regarding whether a government employee was grossly negligent." *Chelsea*, 288 Mich App at 265.

Plaintiffs also argue that Abdilla violated the internal policies of the Township's Fire Department and that he neglected training consistent with those policies. However, it is well-settled that internal policies and procedures cannot " 'fix the standard of [its] duty to others.' " *Meyers v Rieck*, 509 Mich 460, 473; 983 NW2d 747 (2022), quoting *McKernan v Detroit Citizens' Street R Co*, 138 Mich 519, 530; 101 NW 812 (1904). In *Meyers*, our Supreme Court explained that "a defendant's violation of its own internal rule, even if the rule is designed to protect the public, does not constitute negligence per se." *Meyers*, 509 Mich at 473. "As such, the mere allegation that a defendant breached its own internal rule or regulation does not, without more, make out a claim for negligence." *Id*. See also *Baker v Mich Central R Co*, 169 Mich 609, 637; 135 NW 937 (1912) (holding that private rules "do not fix the obligations and liabilities of the master to its servants, nor to third persons and the public, those obligations, being fixed by law, cannot be diminished by such rules, nor, ordinarily, increased thereby"); and *Dixon v Grand Trunk Western R Co*, 155 Mich 169, 173-174; 118 NW 946 (1908) (applying holding that, under *McKernan*, negligence could not be predicated on the failure to enforce a private rule). The *Meyers* Court further acknowledged that a contrary position "might also discourage entities from adopting internal rules that require a 'higher degree of care than the law imposes. . . . [I]f the adoption of such a course is to be used against him as an admission, he would naturally find it to his interest not to adopt any rules at all.' " *Meyers*, 509 Mich at 474. Ultimately, "the law 'neither permits corporations to legislate away their responsibilities by rules, nor imposes discriminating liabilities upon them by reason of their efforts to lessen public danger.' " *Meyers*, 509 Mich at 474-475, quoting *McKernan*, 138 Mich at 532. Thus, the Township's internal training policies cannot fix the standard of care in order to establish ordinary negligence. As such, it also cannot establish gross negligence.

Further, Abdilla's testimony stating his disagreement with certain aspects of his training—such as the concept that activated emergency signals merely constitute a request for permission to have the right of way when proceeding through a red traffic light— is not evidence of gross negligence. Notably, despite his opinion that emergency vehicle drivers did not need to ask other drivers for their "permission" to yield the right-of-way, Abdilla did not testify that emergency drivers were *never* required to yield to other drivers or stop at red traffic lights or blind intersections. Rather, he testified that whether an emergency driver needed to completely stop, rather than merely slow down, depended on the specific circumstances. Here, as mentioned, Abdilla articulated his reasons for believing, at the time of the accident, that he could proceed slowly through the intersection without causing a collision. While this decision may have been

negligent given the circumstances, it does not constitute "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a).

For the foregoing reasons, even viewing the record in a light most favorable to plaintiffs, reasonable minds could not conclude that Abdilla operated the ambulance in a grossly negligent manner. *Dougherty*, 340 Mich App at 345. Accordingly, Abdilla is afforded governmental immunity from plaintiffs' third-party negligence claims under MCL 691.1407(2), and Abdilla was therefore entitled to summary disposition under MCR 2.116(C)(7) and MCR 2.116(C)(10). The trial court erred to the extent it denied defendants' motion for summary disposition relative to Abdilla.

## 3. OWNER'S LIABILITY

Plaintiffs next contend that, even if Abdilla was not grossly negligent, HVA can be held vicariously liable for Abdilla's ordinary negligence under the owner's liability statute, MCL 257.401(1). We disagree. In *Alex v Wildfong*, 460 Mich 10, 21-22; 594 NW2d 469 (1999), our Supreme Court concluded that a finding of immunity under the GTLA precluded a finding of liability under the owner's liability statute, even in cases where the vehicle is not a government-owned vehicle. Moreover, MCL 257.401 provides only "vicarious liability of an automobile owner for the negligence of a driver." *Kaiser v Allen*, 480 Mich 31, 38; 746 NW2d 92 (2008). Accordingly, because Abdilla is immune from tort liability, HVA cannot be vicariously liable under MCL 257.401.

## 4. EXCLUSIVE REMEDY PROVISION

Defendants next argue the trial court erred by denying their motion for summary disposition relative to their claims that HVA was entitled to the protection of the exclusive-remedy provision of the WDCA. "[W]hether a business entity is a particular worker's 'employer,' as that term is used in the WDCA, is a question of law for the courts to decide if the evidence on the matter is reasonably susceptible of but a single inference." *Clark v United Technologies Auto, Inc*, 459 Mich 681, 693-694; 594 NW2d 447 (1999). "Only where evidence of a putative employer's status is disputed, or where conflicting inferences may reasonably be drawn from the known facts, is the issue one for the trier of fact to decide." *Id*. at 694.

The WDCA provides that an employee's "right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease." MCL 418.131(1). Because the exclusive remedy provision does not define the term "employer" in a manner relevant to the present inquiry, Michigan courts apply "the 'economic realities test' to determine whether an employment relationship exists for purposes of the exclusive remedy provision, and thus whether an individual or entity is the 'employer' of a given employee." *Clark*, 459 Mich at 687. When applying the economic-reality test, courts assess the totality of the circumstances but focus on the following four factors: "(1) the control of a worker's duties, (2) the payment of wages, (3) the right to hire and fire and the right to discipline, and (4) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal." *Id*. at 688 (quotation marks, citation, and alteration omitted). "No one factor is controlling." *Id*. at 689. In addition to the foregoing factors, "[a] salient factor in determining an employee-employer relationship in the parent-subsidiary context is the use of a

combined worker's compensation insurance policy by both parent and subsidiary." *James v Commercial Carriers, Inc*, 230 Mich App 533, 539; 583 NW2d 913 (1998). "Combined bookkeeping and accounting, together with income tax treatment that regards the corporations as a single entity, has also been a persuasive factor in supporting the conclusion that two corporations should be treated as one for the purposes of the exclusive remedy provision." *Id*.

*Wells v Firestone Tire & Rubber Co*, 421 Mich 641; 364 NW2d 670 (1984) is the leading case when analyzing whether an employee-employer relationship exists within a parent-subsidiary context. In *Wells*, 421 Mich at 650, our Supreme Court acknowledged "the general principle that in Michigan separate entities will be respected." However, after applying the economic-reality test to the specific facts before it, the *Wells* Court departed from this general principle and effectively engaged in a "reverse-piercing" of the corporate veil of the parent corporation in question. *Id*. at 648-650; see also *Clark*, 459 Mich at 689-690. The *Wells* Court "premised its willingness to depart from the general rule and disregard the separate corporate entities in that case on the Court's recognition of the important public policies underlying the [WDCA] and [its] belief that a contrary determination would be inequitable under the facts of [the] case." *Clark*, 459 Mich at 690 (quotation marks and citation omitted; first alteration in original). Accordingly, "in the classic *Wells* parent-subsidiary scenario, an essentially vertical relationship exists between two business entities who, if warranted by the application of the economic realities test and the equities of the case, will be treated as essentially one entity for purposes of the exclusive remedy provision." *Id*. at 691.

Regarding the public policy considerations underlying the WDCA, the *Wells* Court acknowledged that, "[b]y agreeing to assume responsibility for all employment-related injuries, employers protect themselves from the possibility of potentially excessive damage awards. In order to effectuate these policies, the statute has been liberally construed to provide broad coverage for injured workers." *Wells*, 421 Mich at 651. The *Wells* Court then concluded that, "[i]f the statute is to be construed liberally when an employee seeks benefits, it should not be construed differently when the employer asserts it as a defense to a tort action brought by the employee who claimed and accepted benefits arising from that employment relationship." *Id*.

Here, the trial court denied defendants' motion for summary disposition relative to their WDCA arguments on the basis of its conclusion that EHP, not HVA, was Schenk and Robert Reed's employer. In doing so, the court did not err.

First, there is no real dispute that EHP controlled Schenk and Robert Reed's work duties. Although Ronald Slagell, the president and chief executive officer (CEO) of both EHP and HVA, testified that Robert Reed's "everyday functions" were "tied to HVA," he did not identify any ways in which HVA actually *controlled* the daily job functions of Schenk or Robert Reed. Rather, Slagell's testimony merely indicated that Robert and Schenk utilized HVA-owned ambulances and equipment to accomplish their job duties and presented themselves as HVA employees by wearing uniforms bearing HVA's name. In contrast, Slagell's deposition testimony and Robert Reed's affidavit indicated that EHP's employees handled the administrative aspects of Schenk and Robert Reed's daily employment, including scheduling the days and times they worked. Similarly, although Robert Reed's affidavit and Slagell's testimony conflict regarding whether Robert's direct supervisor was a sole employee of EHP or a dual employee of HVA and EHP, this dispute arises from Slagell's apparent belief that each employee of any EHP subsidiary, such as HVA, was

also an employee of EHP such that the two separate sources of employment were indistinguishable. There is no evidence in the record that any employee worked solely for HVA, nor is there any indication that HVA singularly controlled any aspect of Robert's or Schenk's EMT duties.

Second, although EHP administered payroll for employees who worked on HVA's ambulances, the economic reality was that HVA actually paid the employees' wages. Specifically, plaintiffs presented evidence that EHP issued Robert's and Schenk's paychecks, and Slagell testified that EHP issued the paychecks using funds drawn from accounts owned and operated by EHP. However, Slagell also testified that EHP did not independently earn any funds. Instead, EHP used revenue collected by its subsidiaries to fund employee payroll. Regarding Robert and Schenk, specifically, Slagell testified that HVA funded their paychecks and, if not for the funding provided by HVA, EHP would not have had any means to pay their wages.

Third, there is no genuine dispute that EHP had the right to hire the EMTs who worked on HVA's ambulances. Schenk provided documentary evidence that EHP hired her, and Slagell testified that EHP's human resources department handled hiring for all of EHP's subsidiaries. Although Robert was hired by HVA, this occurred before EHP was created. The record is less clear regarding the right to fire or discipline the EMTs who worked on HVA's ambulances. However, it nonetheless preponderates that EHP again had sole firing and disciplinary authority. Specifically, Robert Reed's affidavit and Slagell's testimony both indicate that Robert Reed's direct supervisor was an EHP employee. To the extent Slagell testified that the same supervisor was also an employee of HVA, this again speaks to Slagell's view of the employment relationship between EHP and its subsidiaries as indistinguishable. Similarly, Slagell identified the individuals with the power to fire Robert or Schenk as employees of both EHP and HVA.

Finally, the record indicates that the work performed by the EMTs on HVA's ambulances was an integral part of EHP's business toward the accomplishment of a common goal. Slagell's uncontradicted testimony indicated that HVA was created in 1981, to provide ambulatory services throughout Washtenaw County. As HVA's operations expanded, HVA formed additional entities to provide services to other communities, each of which were initially subsidiaries of HVA. When EHP was later formed as an "administrative parent company," HVA and its former subsidiaries underwent corporate restructuring and all became subsidiaries of EHP. EHP acted as "the administrative arm of the organization so that the individual ambulance companies could then focus on the ambulance operations." More specifically, EHP handled the administrative aspects of the organization, such as billing, financing, human resources, employee training, payroll, insurance coverage for the organization's employees, and community relations. EHP did not, itself, have any ambulance operations, own any ambulances, or independently earn any funds. Rather, as previously mentioned, revenue collected by the ambulance services of EHP's subsidiaries, such as HVA, "flow[ed] upward" to EHP to fund the administrative functions it carried out on behalf of itself and its subsidiaries. Slagell confirmed that it was "the existence of HVA itself and not EHP that allow[ed]" Robert and Schenk "to actually have a job . . . ." Thus, the existence of both HVA and EHP are integral to their combined ability to provide ambulatory services to the communities HVA served.

Notably, there are several additional considerations that, when analyzed together with the primary factors of the economic-reality test, lead us to conclude that EHP and HVA should be treated as essentially one entity for purposes of the exclusive remedy provision of the WDCA. In

this respect, we find a brief comparison of the facts of this case to *James* and *Wodogaza v H & R Terminals, Inc*, 161 Mich App 746; 411 NW2d 848 (1987), instructive.

In *James*, 230 Mich App at 535, the plaintiff worked for Fleet Carrier Corporation. Fleet and the defendant were both wholly owned subsidiaries of Ryder System, Inc. *Id*. Fleet sent the plaintiff to premises owned by the defendant, where the plaintiff was hurt. *Id*. After applying for workers' compensation benefits from Fleet, the plaintiff received the benefits from a third wholly-owned subsidiary of Ryder, which subsidiary was responsible for administering all workers' compensation claims for Ryder and Ryder's subsidiaries. *Id*. Plaintiff then filed a negligence lawsuit against the defendant. *Id*. at 535-536. The *James* Court ultimately found that, under the totality of the circumstances there, "Fleet and [the] defendant must be considered components of the same employer, their parent corporation Ryder, for purposes of the WDCA." *Id*. at 542. The *James* Court reasoned:

> In addition to sharing a filing for worker's compensation self-insurer status, these subsidiaries share numerous financial functions through their connection to the parent corporation. Cash management and treasury functions for all Ryder subsidiaries are performed by Ryder's central staff at its corporate headquarters in Miami. All Ryder customers send their payments to depository accounts that are dispensed into concentration accounts at the end of every day. The money in the concentration accounts is transferred into disbursement accounts that process all Ryder's subsidiaries' disbursements. Moreover, there is a unity of management between the parent corporation Ryder and each of its subsidiaries. Defendant and Fleet share the same three directors, one who is also a director, president, and CEO of Ryder, and another who is a senior executive vice president of Ryder. Defendant has twenty-seven officers and Fleet has twenty-two officers, nineteen of which they share. [*Id*. at 542-543.]

By contrast, in *Wodogaza*, 161 Mich App at 748-749, the plaintiff, who was employed by the parent corporation, was injured on the premises of the defendant H & R Terminals, Inc., by a tractor owned by the defendant S & P Equipment, Inc. Both of the defendants were wholly owned subsidiaries of the parent company. *Id*. at 749. After receiving workers' compensation benefits from the parent company, the plaintiff sued the subsidiary defendants. *Id*. After analyzing the specific facts of that case, together with "certain equitable considerations," the *Wodogaza* Court concluded that the defendant subsidiaries were not entitled to protection from the exclusive remedy provision of the WDCA. *Id*. at 757. In coming to this conclusion, the *Wodogaza* Court noted the following:

> Defendant H & R Terminals, Inc., was organized solely for the purpose of owning land and leasing it back to its parent corporation, Preston Trucking Company, Inc. Defendant S & P Equipment, Inc. was organized for the purpose of owning equipment and leasing it back to Preston. Neither of the wholly owned subsidiaries had any employees other than their statutorily required officers, and their offices and activities were controlled by Preston. Neither carried workers' compensation coverage. There is no intimation that anyone other than Preston exercised control over plaintiff, paid his wages, or was responsible for the imposition of discipline.

Under these circumstances, it seems clear that Preston, and neither S & P nor H & R, was plaintiff's employer. [*Id*. at 753-754.]

Additionally, the *Wodogaza* Court distinguished the equities of that case from those present in *Wells*. *Id*. at 755-756. In this respect, the *Wodogaza* Court found particularly significant that the defendant subsidiaries sought "to shield themselves from tort liability without having assumed any concomitant liability for the payment of workers' compensation benefits. Defendants have never accepted any responsibility for the work-related injuries of their parent's employees." *Id*. at 756.

The present cases are more analogous to *James* than to *Wodogaza*. Here, like in *Wodogaza*, EHP controlled the work duties of employees working on HVA's ambulances and had the exclusive right to hire, fire, and discipline those employees. Unlike in *Wodogaza*, however, HVA was not merely a shell corporation. Although only HVA owned the ambulances and equipment used in its ambulance operations, it did not avoid responsibility for the work-related injuries of the employees who used its ambulances and equipment in the course of their employment. Instead, HVA, through its payments to EHP, solely funded the workers' compensation insurance benefits for these employees.

Additionally, like in *James*, 230 Mich App at 542-543, HVA and the other subsidiaries of EHP shared "financial functions" and had a "unity of management" with EHP. Specifically, Slagell's uncontradicted deposition testimony indicated that, although each of EHP's subsidiaries had individual bank accounts, payments made to each subsidiary were collected in a single, common lockbox, and EHP's vice president of finance was responsible for bookkeeping for the accounts of EHP and EHP's subsidiaries. In his affidavit, Slagell stated that he was the president and CEO of both EHP and HVA. Although a direct year-to-year comparison of the officers and directors of EHP and HVA is not available, a comparison between EHP's directors and officers in 2019 against those of HVA in 2018 reveals that, in those years, EHP and HVA shared the same treasurer and secretary, as well as five common directors. In 2019, both HVA and EHP also had the same resident agent and registered office mailing address.

Considering the totality of the circumstances, HVA is considered an integral component of its parent corporation, EHP, such that HVA is entitled to the exclusive remedy provision of the WDCA. See *id*. at 544. Although Schenk and the Reeds dispute HVA's entitlement to protection under the WDCA, they have not presented any evidence that actually calls the relationship between EHP and HVA into dispute. Similarly, there are no conflicting inferences that can be drawn from the available evidence regarding the relationship between EHP and HVA. Accordingly, defendants were entitled to summary disposition under MCR 2.116(C)(4). *Clark*, 459 Mich at 693-694. The trial court therefore erred in denying defendants' motion for summary disposition on this ground.

This conclusion does not conflict with this Court's previous decision in *Reed*. Within the context of finding summary disposition inappropriate because there was insufficient evidence to conclude that no genuine issue of material fact existed regarding each factor of the economic-reality test, the *Reed* Court analyzed the parent-subsidiary relationship between EHP and HVA against those present in *Wells* and *James* and determined that (1) *Wells* was distinguishable because the plaintiff there sued the parent corporation that paid workers' compensation benefits, whereas Robert and Schenk sued HVA, the subsidiary corporation that did not pay their WDCA

benefits, and (2) *James* was distinguishable because HVA did not present "relevant evidence of the sort considered in *James*." *Reed*, unpub op at 6. On remand, however, those conclusions are negated by the relevant portions of Slagell's deposition testimony, which shed more light on the relationship between HVA and EHP.

The law-of-the-case doctrine does not preclude defendants from prevailing on this issue on remand. Under the law-of-the-case doctrine, "if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same." *Krieger*, 348 Mich App at 173 (quotation marks and citation omitted). "The purpose of the doctrine is primarily to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Rott v Rott*, 508 Mich 274, 286-287; 972 NW2d 789 (2021) (quotation marks and citations omitted). Here, defendants obtained deposition testimony from Slagell after the *Reed* Court remanded to the trial court for further proceedings. This deposition testimony contained new material information regarding the relationship between EHP and HVA that directly impacted the trial court's ability to determine whether HVA could be considered Schenk and Robert's employer for purposes of the WDCA. Thus, because facts did not remain materially the same, the law-of-the-case doctrine did not apply.[5]

Reversed and remanded for entry of an order granting summary disposition in defendants' favor on the issues of governmental immunity and WDCA protections. We do not retain jurisdiction. Defendants may tax costs under MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ Christopher M. Trebilcock

---

[5] Our conclusions that Abdilla and the Township were entitled to governmental immunity and plaintiffs' claims against HVA were precluded by the exclusive-remedy provision of the WDCA act to bar all of plaintiffs' claims against defendants. "An issue is moot if an event has occurred that renders it impossible for the court to grant relief. An issue is also moot when a judgment, if entered, cannot for any reason have a practical legal effect on the existing controversy." *King v Mich State Police Dep't*, 303 Mich App 162, 192; 841 NW2d 914 (2013) (quotation marks and citation omitted). Here, the issues related to EMSA immunity are moot because, regardless of our conclusions as to those matters, plaintiffs' claims against defendants are precluded by governmental immunity, as to Abdilla and the Township, and the exclusive-remedy provision of the WDCA, as to HVA.

-14-